**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **JOHN TARPLEY, INDIVIDUALLY,** ) | |
| **NICOLE TARPLEY, INDIVIDUALLY,** ) | **CASE NO.** |
| **LTS, INDIVIDUALLY THRU HIS PARENT** ) | |
| **NICOLE TARPLEY, NLT, INDIVIDUALLY** ) | |
| **THRU HER PARENT NICOLE TARPLEY,** ) | |
| **JWT JR., INDIVIDUALLY THRU HIS PARENT**) | |
| **NICOLE TARPLEY , DAT, INDIVIDUALLY** ) | **VIOLATION OF CIVIL RIGHTS** |
| **THRU HIS PARENT NICOLE TARPLEY** ) | **(42 U.S.C. § 1983)** |
| *Plaintiffs.* ) | |
| ) | |
| **vs.** ) | |
| ) | |
| ) | |
| **PAMELA MCCLAIN IN HER INDIVIDUAL** ) | |
| **CAPACITY, PATRICIA MANNING IN HER** ) | |
| **INDIVIDUAL CAPACITY, CRYSTAL ETUK** ) | **JURY TRIAL DEMANDED** |
| **IN HER INDIVIDUAL CAPACITY, AND** ) | |
| **DOES 1-10, INCLUSIVE** ) | |
| *Defendants.* ) | |

---

## COMPLAINT

---

Plaintiffs JOHN TARPLEY, NICOLE TARPLEY,  AND MINORS LTS, NLT, JWT, JR., and

DAT thru their Parent  NICOLE TARPLEY for their Complaint against the above-named Defendants,

respectfully states and alleges as follows:

### JURISDICTION

1.      Plaintiffs brings this civil rights lawsuit pursuant to 42 U.S.C. Section 1983 to redress

the deprivation by Defendants, at all times herein acting under color of state law, of rights, secured to

Plaintiff under the Constitution of the United States, including the Fourth and Fourteenth Amendments.

2.      Jurisdiction is conferred on this Court by 28 U.S.C. Sections 1343(a)(3) and (a)(4), which provide for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C. Section 1983.  Jurisdiction is also conferred by 28 U.S.C. Section 1331 because claims for relief derive from the Constitution of the United States and the laws of the United States.

3.      Venue is properly established in the United States District Court for the Southern District of Texas pursuant to 28 U.S.C. Section 1391, in that the events and circumstances herein alleged occurred in Harris County, Texas, and all of the Defendants were either employed in or are residents of Harris County, Texas where jurisdiction is the United States District Court for the Southern District of Texas, Houston, Division.

## **PARTIES**

4.   At all times relevant to the facts and circumstances in the Complaint, Plaintiff JOHN TARPLEY (hereinafter referred to as "JOHN") AND NICOLE TARPLEY (hereinafter referred to as "NICOLE") were residents of Harris County, Texas.  NICOLE is the natural mother and parent of minors:  LTS, (now 16 years old), NLT (now 11 years old), JWT JR (now 10 years old), and DAT (now 6 years old), (a fictitious name is used to protect each of the minor's privacy).  JOHN is the natural father and parent of minors, NLT (now 11 years old), JWT JR (now 10 years old), and DAT (now 6 years old), At the time, the incidents giving rise to the causes of action in this Complaint occurred, LTS was 14 years old, NLT was 9 years old, JWT JR was 8 years old, and DAT was 4 years old). At all times relevant herein, prior to the incidents complained of as occurring on November 9, 2015 and December 20, 2015, JOHN AND NICOLE cared for and nurtured their children, enjoyed the company, companionship, and society of her children, and all other benefits and burdens of her rights of familial association with their children.

5.   At all times applicable herein, Defendant social worker PAMELA MCCLAIN (hereinafter referred to as "PAMELA") was an individual residing on information and belief, in Harris County, Texas, and an officer, agent, and/or employee of the Texas Department of Family and Protective Services ("TDFPS") and whose acts as alleged herein were performed in her individual capacity and/or under color of state law. She is employed by the State of Texas, TDFPS in Houston, Texas.

6.   At all times applicable herein, Defendant social worker CRYSTAL ETUK (hereinafter referred to as "CRYSTAL") was an individual residing on information and belief, in Harris County, Texas, and an officer, agent, and/or employee of the Texas Department of Family and Protective Services ("TDFPS") and whose acts as alleged herein were performed in her individual capacity and/or under color of state law. She is employed by the State of Texas, TDFPS in Houston, Texas.

7.   At all times applicable herein, Defendant social worker PATRICIA MANNING (hereinafter referred to as "PATRICIA") was an individual residing on information and belief, in Harris County, Texas, and an officer, agent, and/or employee of the Texas Department of Family and Protective Services ("TDFPS") and whose acts as alleged herein were performed in her individual capacity and/or under color of state law. She is employed by the State of Texas, TDFPS in Houston, Texas.

8.   Plaintiffs are informed and believe, and on such basis alleges, that each of the named Defendants was and is the agent, employee, principal, employer and/or co-conspirator of each of the remaining Defendants and/or vice versa.  In addition, Plaintiffs are informed and believe, and on such basis alleges, that the Defendants named hereinabove, and each of them, are responsible in some manner for the occurrences herein alleged, and that each of the above-named Defendants conspired with, and/or sided and/or abetted and/or jointly collaborated with each of the remaining Defendants and identified persons in committing the acts herein alleged.

9.   Plaintiffs are informed and believe and on such basis alleges that each of the above named Defendants and settling co-conspirators was acting under the color of state law in committing the acts

herein alleged, and that in doing the things herein alleged Defendants, and each of them, were acting within the course and scope of their duties as employees or agents of each other.

10. Plaintiffs are ignorant of the true names and capacities of those Defendants sued herein as DOES 1 through 10, and for that reason have sued such Defendants under such fictitious names. Plaintiff reserves her rights, and will seek leave of Court to amend this Complaint to identify said Defendants when their identities have been ascertained. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named Defendants was in some manner liable and legally responsible, in that their conduct caused the damages and injuries set forth herein.

11. Plaintiffs are informed and believe and on such basis alleges that at all relevant times, Defendants, and each of them, were the knowing agents and/or alter egos of one another, and that Defendants directed, ratified, and/or approved the conduct of each of the other Defendants, and each of their agents or employees, and are therefore vicariously liable for the acts and omissions of their co-defendants, their agents and employees, as more fully alleged herein. Moreover, all of the Defendants and identified persons agreed upon, approved, ratified, and/or conspired together to commit all of the acts and/or omissions alleged in this Complaint.

## FACTUAL ALLEGATIONS

### PRIOR TO THE SEIZURE OF THE FOUR (4) CHILDREN

12. Prior to the seizure of the FOUR (4) children there were two (2) occasions where JOHN was transported to a hospital for mental evaluations and inpatient treatment. The first incident was on November 9, 2015 where JOHN threatened suicide after drinking alcohol. This was reported to TDFPS on November 10, 2015 after JOHN was transported to the hospital. After he was checked over at the hospital he was released. The children had no knowledge of the incident as they were playing safely in their rooms. LTS was spending the night at his grandparents' home. TDFPS never investigated the

incident or contacted the family. Based on information and belief, this incident was <u>never</u> closed prior to the second incident.

13. The second incident happened on December 20, 2015. JOHN inferred a threat to commit suicide after drinking alcohol. The police officers were summoned and did not believe that he needed psychiatric care. Instead John was taken to the hospital because he exhibited stroke-like symptoms. He was transported to the hospital, examined, and released. The children were unaware of the incident until the police arrived. At this time, the situation was already under control. NICOLE left the children in the care of their uncle to transport JOHN. LTS was staying the night at his grandparents' home and not present for this incident either. NICOLE picked JOHN up from the hospital and took him to a psychiatric hospital where NICOLE convinced a police officer to have him admitted for evaluation. TDFPS then started an investigation after receiving a report on or about December 21, 2015.

14. On December 28, 2015, PAMELA conducted an investigation. A face-to-face interview occurred between a trainee named TRENT who was under the supervision of PAMELA. TRENT and PAMELA then demanded that JOHN enroll in a 90-day Alcoholic program and was told that *JOHN was not allowed back into the home until he completed this program or PAMELA would seize the children. This was demanded by PAMELA even though there was no hearing adjudicating the merits of the removal of JOHN from the home.* JOHN told the doctor that TDFPS wanted him to do the 90-day program and it was included in his discharge plan goals.

15. This demand was made before PAMELA even saw or interviewed the children. JOHN was discharged from the hospital on December 29, 2015 and did **not** return to live in the home because of PAMELA's threat to remove the children if he returned.

16. PAMELA then demanded that JOHN and NICOLE sign a "safety plan" under threat that signing the "safety plan" was in lieu of removing the children. JOHN and NICOLE signed the "safety plan" under duress and fear of their children being removed.

17.  JOHN attempted to enter an alcohol rehabilitation program at the demand of PAMELA.  The doctor at the rehab facility said that JOHN did not qualify for in-patient rehab. NICOLE relayed this to PAMELA. PAMELA insisted that JOHN be in a rehabilitation program and that FBSS would pay for it, but PAMELA never drafted the proper documentation to submit the Form 2054 for payment.

18. On January 16, 2016 at 12:30 a.m., Deer Park Police officers knocked on the door of residence to conduct a welfare check allegedly at the insistence of PAMELA. JOHN and NICOLE had advised PAMLEA of retaining an attorney the afternoon before the welfare check. The children were fine.

19. At a meeting on January 25, 2016, both JOHN and NICOLE were in compliance with the *Safety Plan* they signed under duress.

20. From the time PAMELA investigated this family commencing on December 22, 2015 over a month lapsed with no further incidents and there was no emergency. On February 4, 2016, NICOLE's father was admitted to the hospital for open heart triple bypass surgery. During this time from admittance to the hospital to release, JOHN still was never unsupervised with the children. On February 9, 2016, NICOLE's attorney, THOMAS BURTON ("BURTON") had discussed with an associate of TDFPS Attorney COX who advised BURTON there was no emergency involving the children.

21. ON FEBRUARY 10, 2016, PAMELA submitted a "sworn affidavit" in support of an "Emergency Order" from the Court to remove the four (4) children even though there was "no emergency".

22. On FEBRUARY 10, 2016, the Court issued the "Emergency" Order to remove the four (4) children relying on fabrication of evidence, false statements, and intentional misrepresentations by PAMELA even though there was "no emergency".

**THE "SWORN AFFIDAVIT" BY PAMELA INCLUDED FABRICATION OF EVIDENCE, FALSE STATEMENTS, AND INTENTIONAL MISREPRESENTATIONS TO OBTAIN A REMOVAL ORDER FOR ALL MINOR CHILDREN, LTS, NLT, JWT, JR., AND DAT AS FOLLOWS:**

23. *"I have made reasonable efforts under the circumstances to prevent removal of the child but considering the immediate needs to protect the child, removal of the child in necessary."- Para 3 of the affidavit (page 2). A true and correct copy of the affidavit is attached at **Exhibit A** and* incorporated by reference as though fully plead herein redacted for the minor's names.

**PAMELA DID NOT MAKE REASONABLE EFFORTS. PAMELA did not ascertain that the children were subject to imminent danger. JOHN had been released from the hospital forty-three (43) days prior to the removal of the children, was not living at home, and there were no further incidents since December 21, 2015 that would cause any concern to PAMELA.**

24. *"John threatened to shoot himself in the head last night with a gun. The children were awake but not in the same room with him. Nicole was wrapping Christmas presents and John claimed to Nicole that he was having a stroke and wanted her to pay attention to him. John said he wanted his brother to come take him to the hospital. John then put a gun to his head and threatened to shoot himself. Nicole talked him in putting the gun down. Nicole called the police and EMS. It is believed the Deer Park police responded but the offense number is unknown as is the medic number for EMS". Para 3 of the affidavit (page 3).*

**JOHN did not threaten to shoot himself in this incident. JOHN believed that he was having a stroke. NICOLE had asked JOHN to perform a few tasks to ascertain the**

7

**necessity of taking JOHN to a hospital for evaluation of stroke symptoms. NICOLE is trained to recognize signs of medical emergency. John believed Nicole was not taking him seriously concerning the stroke symptoms and without thinking picked up an unloaded gun and said to NICOLE, "do you think this is a joke?"**

25. "*John denied he was suicidal to the police. Nicole told John if he did not go to the hospital she would file a mental health warrant and have him committed. John then agreed to go to the Clear Lake Regional Hospital and was admitted for stroke symptoms as he had slurred speech from drinking a 12 pack of beer. John may be alcoholic. John gets suicidal when he is drinking. He was drinking last Friday and the Sunday before that. When John drinks he drinks to intoxication.*"  *Para. 3 of the affidavit (Page 3);*

**JOHN was not admitted to Clear Lake regional. He had been discharged from the emergency department with instructions to follow up with a neurologist because of stroke like symptoms. There was no determination of the specific amount of beer consumed. PAMELA made a false statement that JOHN drinks to the point of intoxication every time.**

26. "*JOHN called NICOLE from the hospital and threatened to shoot himself when he got home if she did not pick him up.*"  *Para 3 of the affidavit (page 3);*

  **This statement is a complete fabrication. JOHN called NICOLE and told her to come pick him up or that he would be leaving her.**

27. "*JOHN frequently talks about suicide when he is drinking.*"  *Para 3 of the affidavit (page 3).*

  **This is false statement by PAMELA.**

28. "*John drinks when Nicole is at work. John puts the children in a room and asks them not to*

*come out when he is drinking. It is unknown if the children have ever been injured while with him. John does not lock them in the room just asks them not to come out. The parents have not intentionally injured the children. The children are fed and clothed adequately. Nicole may work at night. It is unknown where Nicole works or how often she works." Para 3 of the affidavit (page 3).*

The children frequently played in their rooms. JOHN would insist they stay in their rooms when it was bedtime. NICOLE worked at night. JOHN was responsible for putting the children to bed when NICOLE worked.  The children were not ever harmed or abused when JOHN was at home.  PAMELA'S statement that "The parents have not intentionally injured the children" implies they have injured the children "negligently" which is a false statement. NICOLE texted PAMELA a screenshot of a calendar detailing her work schedule. NICOLE was forthright with any information PAMELA requested. PAMELA had been informed of the place of employment and schedule. The children stayed with their grandparents at night during the investigation because of NICOLE's work schedule.  PAMELA had knowledge of this but made a false statement.

29.    *"JOHN has been prescribed Gabapentin to wean him from alcohol." Para  3 (page 3) of the affidavit.*

Gabapentin is an anticonvulsant medication that is part of protocol in a hospital when a patient has been drinking and is admitted for evaluation. This drug is a precautionary medication to prevent adverse effects of seizures from detox or withdraw if they may happen. This medication was administered without observation of any withdrawal

**symptoms.  The medication has nothing to do with alcohol weaning. PAMELA again made a false statement.**

30. *"John also stated that all firearms, and weapons will be removed from his home before he goes back home".  John Tarpley FTF Interview (page 5).*

   **This statement is false. John's Brother removed the guns before JOHN was discharged from the hospital. His brother did not give them back. There were no weapons in the home.**

31. *"Due to the neglectful supervision of LS, NT, JT, Jr., and DT by their parents, Nicole and John Tarpley, Sr. and failure to adequately address the issues, TDFPS is requesting to be named temporary managing conservator of the children. It is the opinion of the Texas Department of Family and Protective Services that reasonable efforts have been made to prevent or eliminate the need to remove the child from the parents and allowing the child to remain with either parent is contrary to the child's welfare." Summary Conclusion (page 4).*

   **JOHN and NICOLE were actively participating in services. They had provided TDFPS all   documents and information requested. JOHN and NICOLE continued therapy, attended and participated in all meetings with TDPFS employees. JOHN had never been left alone with the children. Neither JOHN or NICOLE had violated any part of the safety plan nor the goals of the family team meeting. There was no reason to believe that JOHN and NICOLE had failed to adequately address the issues.**

*/   /   /*

*/   /   /*

32. *"There is no available placement at this time".  Last page of affidavit (page 12).*

**In a phone interview completed on January 5, 2016, PAMELA notated, "MICHAEL states that NICOLE and the kids can live them for any amount of time." MICHAEL and CHERYL were listed as possible placement on the form completed on January 4, 2016. PAMELA had more than a month to determine if placement with the grandparents was satisfactory. The children had been temporarily staying nights with their grandparents during the investigation starting the night that JOHN was discharged from the hospital. PAMELA never did a home study at the grandparent's home until after removal of the children.**

33. *"Due to the neglectful supervision of LTS, NLT, JWT JR, and DAT by their parents NICOLE and JOHN TARPLEY SR, failure to adequately address the issues, TDFPS requests to be named temporary managing conservator of the children. It is the opinion of the Texas Department of Family and Protective Services that reasonable efforts have been made to prevent or eliminate the need to remove the children from their parents and allowing the children to remain with either parent is contrary to the child's welfare".  Conclusion and Requested Relief (page 12).*

a. **LTS was not in the home during either of the incidents of concern. He was staying at his grandparent's home over holiday breaks from school. PAMELA knew there was no abuse or neglect. The younger children were in their rooms either sleeping or playing at the time of both incidents. NICOLE was of sound mind and in a supervisory capacity of the children. Both incidents occurred at night when the**

11

children were safely in their rooms. NICOLE arranged for immediate removal of JOHN by either police or ambulance. JOHN never threatened to harm the children. The children were not aware of either situation until the police arrived. NICOLE arranged for proper care of the children while she took JOHN to the hospital. NICOLE acted in a reasonable and timely fashion to remove any situation that could have been contrary to the children's welfare. The children were never harmed because of a result of any alleged neglect.

b. PAMELA believed that the children were not in any danger with NICOLE from the date of the incident on December 20, 2015 until February 4, 2016. The email from the parents' attorney stating the necessity of JOHN's return to the home visa vie a family emergency with MICHEAL was the deciding factor that the children were in imminent danger.

c. NICOLE was in a supervisory capacity of JOHN and the children during the investigation. TDFPS had been approached multiple times by NICOLE, JOHN, and their attorney seeking approval to return home. These requests were met with hostility and threats to remove the children. JOHN and NICOLE knew that his banishment had not been properly executed, but complied with TDFPS demand in fear of removal. JOHN's return was a goal discussed in the family team meeting on January 25, 2016. TDFPS agreed to JOHN's return after proper documentation to alleviate their concerns was provided. These documents were provided before or by February 2, 2016. TDFPS failed to decide concerning these documents. NICOLE and JOHN diligently and expeditiously provided all demands of TDFPS and followed up with TDFPS employees' multiple times to discuss the status of said decision. It is obvious that PAMELA, was trained in the constitutional rights of parents and

children by TDPFS and she maliciously pursued her own agenda at the expense of JOHN and NICOLE and their four children.

d.  JOHN and NICOLE were trying to address the issues. A Family Team Meeting was held on January 25, 2016.  At the end of the meeting, JOHN, NICOLE, and their council reviewed the summary of the meeting. JOHN and NICOLE. There were purported facts that were false. JOHN and NICOLE's attorney noted on the original signed copy, "Tarpleys' deny CPS' version of allegations in several respects." During the FTM, a discussion of continued banishment was addressed. FBSS representative, CPS representatives, and plaintiffs' representative came to an agreement that JOHN would stay out of the home until compliance of record release to ease TDFPS concerns. The plaintiffs' representative wrote:

> *"Tarpley's agree to abide by safety plan until CPS is provided with proof*
> *of medication compliance and therapy attendance."*

34. PAMELA and PATRICIA allowed three (3) of the children, LTS, JWT JR, and DAT to be taken to foster homes for no reason. The remaining child NLT stayed with the grandmother because of her delicate medical condition.

35. PATRICIA as supervisor of PAMELA was involved in all the decision making and approved the actions of PAMELA even though PATRCIA knew they were false and misleading. PATRICIA knew the Affidavit completed by PAMELA was fabricated with lies and misrepresentations.


**THE FABRICATION OF EVIDENCE AT COURT HEARING BY CRYSTAL**


*36. At the Status Hearing held on April 6, 2016, CRYSTAL told the court that she had no knowledge of a Drug and Alcohol Assessment that JOHN submitted to the court and requested another assessment be submitted.*

13

**On, April 5, 2016, JOHN completed a Drug and Alcohol Assessment at Phoenix House/ The receptionist at Phoenix House spoke with CRYSTAL to obtain permission and 2054 information for the appointment. TDFPS employees had sent a referral and 2054 to Phoenix House on March 23, 2016. JOHN's results were unremarkable with no further recommendations for any treatment or program referral. CRYSTAL knew her testimony was false.**

37. *On April 6, 2016, CRYSTAL told the court that the parents were unwilling to sign the service plan.*

**JOHN and NICOLE were not allowed to participate in developing the service plan. The service plan was never signed by the parents because they did not know about it until the status hearing. CRYSTAL knew her statement was false.**

38. *"At subsequent hearings, Commencing September 14, 2016, CRYSTAL made misrepresentations to the Court stating continually that both JOHN and NICOLE did not complete their services."*

**This was a complete fabrication of evidence to a Court. CRYSTAL had knowledge of the parent's completed services at the permanency conference held before the above-mentioned hearing. CRYSTAL had filed a permanency report before the hearing stating that the parents were in compliance of their services. This was the first, last and only permanency hearing held 216 days after removal. CRYSTAL neglected to gather information about the parents' services since the Status Hearing in April.**

39. Finally, approximately eight (8) months later the children were returned to JOHN and NICOLE. TDFPS filed a Non-Suit on April 26, 2017.

## COUNT 1

**(Against Defendants MCCLAIN, MANNING, and ETUK
and DOES 1 through 10, inclusive)**

**Violation of Plaintiffs' JOHN TARPLEY AND NICOLE TARPLEY
Federal Civil Rights (42 U.S.C. § 1983)**

**(Fourteenth Amendment Familial Association, Procedural Due Process, Substantive Due Process,
Judicial Deception)**

40.     Plaintiffs re-alleges, and incorporates herein as if set forth in full, all of the preceding
Paragraphs (1-39) above.

41. Plaintiffs are informed and believes and thereon alleges that at all times relevant herein, there
existed a clearly established due process right not to be subjected to false accusations on the basis
of false evidence that was deliberately fabricated by the government, such that a reasonable agent
in Defendants' situation would know, or should know, that it is unlawful to lie, fabricate evidence,
and/or suppress material exculpatory evidence in court reports or any other document filed with
the juvenile court to influence judicial decision making.

42.  In fact, Defendants, and each of them, had the affirmative and self-evident duty to be truthful,
accurate, and complete in providing information which they knew, or had reason to know would
be repeated and treated as evidence in petitions, reports, and documents submitted to a sovereign
court with power to adjudicate substantial rights, including parental rights, and to refrain from
using improper and deceptive means to obtain judicial sustention of recommendations seeking to
disparage Plaintiff's liberty interests.

43. Defendants, and DOES 1 through 10, knew or should have known that by presenting false
allegations and evidence to a Court, and conspiring to invent reasons for removing Plaintiff's
children from her care, would lead to the deprivation of Plaintiffs' civil rights.  Said Defendants,
like any reasonable person, knew or should have known that Plaintiffs had a constitutionally

COMPLAINT

protected right not to be lied about in such consequential judicial proceedings.

44. In doing the things alleged hereinabove, Defendants, and each of them, voluntarily collaborated, acted in concert, and conspired to violate the above identified rights of the Plaintiff, including violation of Plaintiff's' rights found in the Due Process Clause under the Fourteenth Amendment of the United States constitution by, but not limited to, presenting false allegations, false or coerced testimony, fabricated evidence, and/or suppress exculpatory evidence, before the court, **including but not limited to the Affidavit in Support of the Removal Order by PAMELA, the testimony of CRYSTAL at court hearings, and the approval of such actions by PATRICIA knowing they were false** thereby violating Plaintiff's rights found in the  Fourth and Fourteenth Amendment to the United States Constitution and breaching their duty to Plaintiff.

45. In so doing, Defendants, and each of them, were acting under color of state law. They did these things without proper justification or authority.  Further, Defendants' actions were taken with deliberate indifference to Plaintiff's due process rights, and in conscious disregard of Plaintiff's right to not be lied about by government agents/employees in any court proceeding where substantial rights were at stake.

46. Defendants, and each of them, maliciously conspired to violate the civil rights of Plaintiff, including violation of Plaintiff's rights found in the Fourteenth Amendment of the United States Constitution by the use of coercion and duress to obtain evidence and testimony, and by maliciously falsifying evidence, and presenting fabricated evidence to the court, and maliciously refusing to provide exculpatory evidence during the pendency of the dependency proceedings which was a continuing detention of the children outside the care of their mother.

47. Plaintiffs have a right to be free from false or perjured testimony and/or the deliberate suppression of exculpatory evidence. "A [constitutional] right can be clearly established by

common sense only where "conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional" citing *DeBoer v. Pennington*, 206 F.3d 857, 864-65 (9th Cir. 2000), vacated on other grounds by *Bellingham v. DeBoer*, 532 U.S. 992 (2001).)  See *James v. Rowlands*, 606 F.3d 646, 652 (9th Cir. 2010).) The undeniable maxim to "tell the truth" is so deeply ingrained in the charter of the United States' existence that any reasonable oath-beholden government agent – including social workers – would know without guidance from the courts that the use of false or perjured evidence to deprive an individual of their protected liberty interests is *never* justified. (See e.g., *N. Mariana Islands v. Bowie,* 243 F.3d 1109, 1124 (9th Cir. Haw. 2001); see also, *Devereaux v. Abbey*, 263 F.3d 1070, 1084 (9th Cir. Wash. 2001) (Kleinfeld, A., concurring; "[T]hese rules of constitutional law apply not only to police, but also to the appellees in this case, who were social workers, and to others who act on behalf of the state. Anyone who acts on behalf of the government should know that a person has a constitutional right not to be 'framed.'"].) See also *Malik v. Arapahoe County Dep't of Social Servs.,* 191 F.3d 1306 (10th Cir. 1999) and *Morris v. Dearborne,* 181 F.3d 657 (5th Cir. 1999).

48. As the direct and proximate result of the aforementioned actions of PAMELA, PATRICIA, and CRYSTAL, and DOES 1 and 10, and each of them, Plaintiffs have suffered, and will continue to suffer, physical, mental, and emotional injury, all to an extent and in an amount subject to proof at trial.  Plaintiff has also incurred, and will continue to incur, attorney's fees, costs and expenses, including those authorized by 42 U.S.C. Section 1988, to an extent and in an amount subject to proof at trial. On information and belief, said defendants, and each of them, acted with malice and with the intent to cause injury to Plaintiff, or acted with a willful and conscious disregard of the rights of Plaintiff in a despicable, vile, and contemptible manner.  Therefore, Plaintiff is entitled to an award of punitive damages for the purpose of

punishing Defendants and to deter them and others from such conduct in the future.

## COUNT 2

**(Against Defendants MCCLAIN, MANNING, & ETUK and
DOES 1 and 10, inclusive)**

**Violation of Plaintiffs' LTS, NLT, JWT, JR. and DAT
Federal Civil Rights (42 U.S.C. § 1983)**

**(Fourteenth Amendment Familial Association, 4th Amendment, Procedural Due Process,
Substantive Due Process, Judicial Deception)**

49.  Plaintiffs reallege, and incorporates herein as if set forth in full, all of the preceding Paragraphs (1-48) above.

50. Plaintiffs are informed and believes and thereon allege that at all times relevant herein, there existed a clearly established due process right not to be subjected to false accusations on the basis of false evidence that was deliberately fabricated by the government, such that a reasonable agent in Defendants' situation would know, or should know, that it is unlawful to lie, fabricate evidence, and/or suppress material exculpatory evidence in court reports or any other document filed with the juvenile court to influence judicial decision making.

51. In fact, Defendants, and each of them, had the affirmative and self-evident duty to be truthful, accurate, and complete in providing information which they knew, or had reason to know would be repeated and treated as evidence in petitions, reports, and documents submitted to a sovereign court with power to adjudicate substantial rights, including parental rights, and to refrain from using improper and deceptive means to obtain judicial sustention of recommendations seeking to disparage the children's  liberty interests.

52. Defendants, and DOES 1 through 10, knew or should have known that by presenting false allegations and evidence to a Court, and conspiring to invent reasons for removing Plaintiff's children from her care, would lead to the deprivation of the children's civil rights by placing them

in different homes that had an adverse impact on their lives.   Said Defendants, like any reasonable person, knew or should have known that the children had a constitutionally protected right not to be lied about in such consequential judicial proceedings.

53. In doing the things alleged herein above, Defendants, and each of them, voluntarily collaborated, acted in concert, and conspired to violate the above identified rights of the Plaintiff, including violation of Plaintiff's rights found in the Due Process Clause under the Fourteenth Amendment of the United States constitution by, but not limited to, presenting false allegations, false or coerced testimony, fabricated evidence, and/or suppress exculpatory evidence, before the court, **including but not limited to the Affidavit in Support of the Removal Order by PAMELA, the testimony of CRYSTAL at court hearings, and the approval of MANNING who knew the fabrication of the affidavit in support of the Removal Order and false testimony by CRYSTAL** thereby violating Plaintiff's rights found in the  Fourth  and Fourteenth Amendment to the United States Constitution and breaching their duty to Plaintiff.

54. In so doing, Defendants, and each of them, were acting under color of state law. They did these things without proper justification or authority.   Further, Defendants' actions were taken with deliberate indifference to Plaintiff's due process rights, and in conscious disregard of Plaintiff's right to not be lied about by government agents/employees in any court proceeding where substantial rights were at stake.

55. Defendants, and each of them, maliciously conspired to violate the civil rights of Plaintiff, including violation of Plaintiffs' rights found in the Fourteenth Amendment of the United States Constitution by the use of coercion and duress to obtain evidence and testimony, and by maliciously falsifying evidence, and presenting fabricated evidence to the court, and maliciously refusing to provide exculpatory evidence during the pendency of the dependency proceedings which was a continuing detention of the children outside the care of her mother.

56. Plaintiffs have a right to be free from false or perjured testimony and/or the deliberate suppression of exculpatory evidence. "A [constitutional] right can be clearly established by common sense only where "conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional" citing *DeBoer v. Pennington*, 206 F.3d 857, 864-65 (9th Cir. 2000), vacated on other grounds by *Bellingham v. DeBoer*, 532 U.S. 992 (2001).)  See *James v. Rowlands*, 606 F.3d 646, 652 (9th Cir. 2010).) The undeniable maxim to "tell the truth" is so deeply ingrained in the charter of the United States' existence that any reasonable oath-beholden government agent – including social workers – would know without guidance from the courts that the use of false or perjured evidence to deprive an individual of their protected liberty interests is *never* justified. (See e.g., *N. Mariana Islands v. Bowie,* 243 F.3d 1109, 1124 (9th Cir. Haw. 2001); see also, *Devereaux v. Abbey*, 263 F.3d 1070, 1084 (9th Cir. Wash. 2001) (Kleinfeld, A., concurring; "[T]hese rules of constitutional law apply not only to police, but also to the appellees in this case, who were social workers, and to others who act on behalf of the state. Anyone who acts on behalf of the government should know that a person has a constitutional right not to be 'framed.'"].) See also *Malik v. Arapahoe County Dep't of Social Servs.,* 191 F.3d 1306 (10th Cir. 1999) and *Morris v. Dearborne,* 181 F.3d 657 (5th Cir. 1999).

57. As the direct and proximate result of the aforementioned actions of PAMELA, MANNING, AND CRYSTAL, and DOES 1 and 10, and each of them, Plaintiffs have suffered, and will continue to suffer, physical, mental, and emotional injury, all to an extent and in an amount subject to proof at trial.  Plaintiff has also incurred, and will continue to incur, attorney's fees, costs and expenses, including those authorized by 42 U.S.C. Section 1988, to an extent and in an amount subject to proof at trial.

58. On information and belief, said defendants, and each of them, acted with malice and with the

intent to cause injury to Plaintiffs, or acted with a willful and conscious disregard of the rights of Plaintiff in a despicable, vile, and contemptible manner. Therefore, Plaintiffs are entitled to an award of punitive damages for the purpose of punishing Defendants and to deter them and others from such conduct in the future.

## PRAYER

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.    General damages and special damages according to proof, but in no event less than $1,000,000 including attorney fees incurred in the state action according to proof at trial.

2.    As against all individual defendants, punitive damages as allowed by law;

3.    Attorneys' fees pursuant to 42 U.S.C. § 1988, and any other appropriate statute;

4.    Costs of suit incurred herein; and

5.    Such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated:  February 7, 2018

/s/ by Edward A. Rose, Jr.
Edward A. Rose, Jr., Esq. (TX BAR No. 24081127)
Southern District of Texas Bar No. 1645585
Attorney-in-Charge
Edward A. Rose, Jr., P.C.
3027 Marina Bay Drive Suite 208
League City, Texas 77573
T (713) 581-6029
F (832) 201-9960
edrose@edroseattorneycpa.com

COMPLAINT